2005 VT 117

## Patricia A. Gettis and James N. Gettis v. Green Mountain Economic Development Corporation, Connecticut River Valley Revolving Loan Fund and Town of Hartford

[892 A.2d 162]

No. 04-262

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed October 28, 2005

*Christopher D. Roy* of *Downs Rachlin Martin PLLC*, Burlington, for Plaintiffs-Appellants.

*Peter G. Beeson* of *Devine, Millimet & Branch, P.A.*, Manchester, New Hampshire, for Defendant-Appellee Green Mountain Economic Development Corporation.

*Robert S. DiPalma* of *Paul, Frank + Collins, P.C.*, Burlington, for Defendant-Appellee Connecticut River Valley Revolving Loan Fund.

*James F. Carroll* and *Susan P. Ritter* of *English, Carroll & Ritter, P.C.*, Middlebury, for Defendant-Appellee Town of Hartford d/b/a Hartford Business Revolving Loan Fund.

¶ 1. **Dooley, J.** Plaintiffs, Patricia and James Gettis, appeal a superior court order granting summary judgment to defendants, Green Mountain Economic Development Corporation, Connecticut River Valley Revolving Loan Fund, and the Town of Hartford. Defendants were involved in loan transactions with plaintiffs. The trial court determined that: (1) all of plaintiffs' claims for noneconomic damages were barred by the statute of limitations; (2) defendants were entitled to summary judgment on plaintiffs' claims for economic damages; (3) plaintiffs could not establish a prima facie case for tortious interference with contractual relations and prospective economic advantage; and (4) there were no grounds for punitive damages. We affirm the first two of the court's decisions and do not reach the remainder.

¶ 2. The parties submitted statements of undisputed facts in support of their summary judgment motions.[1] From these statements, the trial court determined which of the material facts were undisputed and used those facts to render its decision. The following statement of facts is primarily based on the recitation of facts in the summary judgment decision.

¶ 3. For several years, plaintiffs ran an inn and a catering business under the auspices of Gettis, Inc., a subchapter S corporation. In the early 1990s, they sold the inn in order to focus on their catering business. Eventually, they sought start-up funding to open a gourmet, take-out delicatessen to augment their catering business.

¶ 4. After being denied loans by other lenders, plaintiffs approached Green Mountain Economic Development Corporation [GMEDC] for assistance. GMEDC is a regional development corporation that acts as a loan administrator for the other defendants, Connecticut River Valley Revolving Loan Fund [CRV] and Town of Hartford Business Revolving Loan Fund [the Town]. Plaintiffs further developed their business plan with the assistance of Lenae Quillen-Blume, a small business development advisor for the Small Business Administration

---

[1] Defendants specified that many of the facts were undisputed solely for the summary judgment motion. Defendants continue to deny many of these facts, including that there is a link between defendants' actions and plaintiffs' alleged injuries and that there was a promise to lend plaintiffs more money.

[SBA], whose office was located in the GMEDC building. Plaintiffs have alleged that Ms. Quillen-Blume was acting for GMEDC in her interactions with plaintiffs.

¶ 5. Through GMEDC, plaintiffs submitted a "Financing Proposal" to the Town and CRV, seeking a total of $75,000 in financing. Both lenders initially denied the application. Plaintiffs revised their application, reducing their loan request from the Town and CRV to a total of $35,000. On September 20, 1996, James Saudade, executive director of GMEDC, informed plaintiffs that their loan would not be recommended for approval due to insufficient collateral and a concern about noncompetition provisions in the proposed lease for their business location. Plaintiffs worked to address those concerns and identified an alternative location for their business.

¶ 6. On October 30, 1996, CRV approved a $15,000 loan to Gettis, Inc., and on November 26, 1996, the Town of Hartford Selectboard approved a $20,000 loan to Gettis, Inc. Both loans were conditioned upon zoning and permit approval. Throughout November and early December 1996, plaintiffs applied for zoning approval, arranged for health and fire inspections, and worked to secure other necessary permits and licenses.

¶ 7. On December 10, 1996, the parties closed on the two loans, totaling $35,000, even though plaintiffs had not received zoning approval and other permits as required by the loan agreement. On December 18, the Town issued conditional use approval for the delicatessen. The site development plan was approved on December 23. The Town issued a zoning permit for construction and operation of the delicatessen on January 10, 1997.

¶ 8. At the time of the loans, it was expected that the loan proceeds would cover necessary equipment and facilities renovations. Patricia Gettis had already expended over $15,000 on renovations by the time the loans closed, so that the sum was immediately reimbursed. By late January 1997, plaintiffs recognized, however, that the renovations would cost much more than expected because of regulatory requirements imposed by the Vermont Department of Labor and Industry, and that the loan funds would not cover both the renovations and equipment. They determined that they would need an additional $20,000 to purchase equipment. They contacted their GMEDC loan administrator, Margo Watson, who advised them to complete the renovations and to purchase the necessary equipment with personal credit cards. She assured them that funds for an additional consolidated loan at a lower interest rate would soon be available to replace

the credit card debt. Using their credit cards, plaintiffs bought over $20,000 worth of business equipment, which was ultimately subject to the lenders' security interests.

¶ 9. On February 27, 1997, plaintiffs opened "A La Carte," their new delicatessen. In March 1997, plaintiffs met with the loan administrator, Margo Watson, and the SBA advisor to discuss the consolidation loan they desired. They presented the loan administrator with documentation of business equipment purchases they had made on their credit cards. She informed them at that meeting that funds for the consolidation loan they sought would not be available for another six months.

¶ 10. In September 1997, and again in early October, Ms. Gettis was hospitalized with an unprecedented flare-up of her inflammatory arthritis. Her doctor associated the flare-ups with stress and overwork, which, according to Ms. Gettis, was caused by the business's financial difficulties. Ms. Gettis continued to work despite her doctor's pleas to stop. She continued to suffer from aggravated arthritis throughout the period A La Carte was in business. On October 3, 1997, while Ms. Gettis was hospitalized, Mr. Gettis met with the loan administrator and the SBA business development advisor, who informed him that no additional loan funds would be available to replace plaintiffs' credit card debt.

¶ 11. A year later, in early October 1998, the lenders agreed to allow plaintiffs to make interest-only payments from December through March, spreading the principal due during those months over the remainder of the year. On October 9, the loan administrator sent plaintiffs a letter asking them to make payments on their loans immediately, as no payment had been received since August 1998. She also requested that plaintiffs return signed letters acknowledging their agreement with the proposed modified payment plan. On November 3, the executive director of GMEDC sent another letter to plaintiffs, warning them that GMEDC still had not received payment. He informed them that the modified payment plan was conditioned upon plaintiffs bringing their loans current. No payments were made.

¶ 12. On December 1, 1998 the GMEDC executive director sent letters declaring plaintiffs in default on their loans from CRV and the Town and demanding payment in full within fifteen days. A La Carte closed its doors permanently at the end of December 1998. Defendants never repossessed their collateral. Plaintiffs eventually filed for bankruptcy.

¶ 13. Plaintiffs filed suit against defendants GMEDC, CRV, and the Town on December 12, 2001. The counts of the complaint were: (1)

breach of contract; (2) negligent or intentional breach of fiduciary duty; (3) breach of the implied covenant of good faith and fair dealing; (4) equitable and promissory estoppel; (5) negligent or intentional misrepresentation; (6) tortious interference with contractual relations and prospective economic advantage (against GMEDC only); (7) tortious interference with prospective economic advantage (against the Town and CRV only); and (8) negligent or intentional infliction of emotional distress.

¶ 14. The exact bases for plaintiffs' claims are often not specified, but have emerged in the briefing and argument. The central factual allegation behind virtually all of plaintiffs' counts is contained in paragraph fifty-six of the complaint as follows:

> But for the unexpected imposition of personal credit card debt that needed to be serviced with payments much higher than would have been the case if additional loan proceeds had been advanced, the Gettises' business would have met or exceeded the expectations and projections set forth in the original business plan. Thus, but for the burden of personal credit card debt, their business would have been on the track to success.

The first count is based on the failure of defendants to provide additional loans to pay off the credit card debt. The fourth and fifth counts raise various arguments on that subject. According to plaintiffs' fourth count, defendants should be estopped from enforcing the loan terms because they induced plaintiffs' financial failure through the credit card debt and the failure to provide business loans to eliminate that debt. The fifth count alleges misrepresentation because defendants knew they would not extend further credit when they induced plaintiffs to incur credit card debt, but stated that they would provide further loans. The bases for the second, third and eighth counts are not specified, but again appear to be the statement in paragraph fifty-six or a variation on that theme.

¶ 15. In the sixth count, plaintiffs allege that GMEDC tortiously interfered with their loan contracts with CRV and the Town by instructing plaintiffs to purchase equipment with credit cards and preventing plaintiffs' performance of their loan obligations. The seventh count alleges that "CRV/RLF and the Town intentionally and improperly interfered with the Gettises' prospective contractual relations with other actual and potential lenders with whom the Gettises already had, or could otherwise have, pursued supplemental

loans." The complaint also contains vague allegations that suggest that the Town's zoning actions or representations were linked to the unanticipated regulatory requirements imposed by the Department of Labor and Industry and, as a result, the Town was responsible for plaintiffs' inability to finish the renovations and purchase the equipment with the loan amounts provided. To the extent plaintiffs made such allegations, they waived them in their response to defendants' motion for summary judgment either by not actually responding to defendants, or by their express waiver. Plaintiffs seek relief in the form of compensatory damages for economic, emotional, and physical injuries, as well as punitive damages.

¶ 16. Defendants submitted several different motions for summary judgment on the following grounds: (1) the statute of limitations barred plaintiffs' claims for damages for physical and emotional injuries; (2) plaintiffs failed to establish a causal connection between defendants' conduct and the damages alleged; (3) plaintiffs failed to present a prima facie case for tortious interference with contractual relations and tortious interference with prospective economic advantage; (4) plaintiffs failed to present a prima facie case for negligent and intentional infliction of emotional distress; (5) the Town is immune from claims regarding its governmental function of issuing land use permits; and (6) the Town is immune from claims of punitive damages.

¶ 17. Along with their summary judgment motions, defendants submitted a lengthy statement of undisputed material facts. Plaintiffs submitted a counter statement, disputing some of the facts in defendants' statement and agreeing with others. The trial court ultimately granted summary judgment in favor of defendants on all claims, using several different rationales. The court granted summary judgment on counts one through five — the contract-related claims — for failure to establish that defendants' actions caused plaintiffs' injury. The court also found that the statute of limitations barred plaintiffs' claims for damages for physical and emotional injuries, which were found in several claims, but especially in the intentional infliction of emotional distress claim (claim eight). The court held that plaintiffs did not establish a prima facie case against GMEDC for tortious interference with contractual relations, or for tortious interference with prospective economic advantage against any defendant (claims six and seven). Finally, the court denied plaintiffs' claim for punitive damages because it found no actual damages. The trial court did not decide whether plaintiffs established a prima facie case for intentional infliction of emotional distress or whether the Town would qualify for municipal

immunity, as it granted summary judgment on all claims before it reached those issues.

¶ 18. Plaintiffs appeal all of the superior court rulings. We conclude that we need reach only two of those decisions — that plaintiffs' claims for noneconomic loss are barred by the statute of limitations, and that plaintiffs' claims for economic loss fail for lack of causation — in order to dispose of this appeal.

¶ 19. We note that plaintiffs criticize the superior court for failing to state the Rule 56 standard for ruling on a summary judgment motion, and for finding facts that were disputed. The standard for summary judgment is familiar — whether the materials properly before the court "show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3). We review a grant of summary judgment using the same standard as the trial court, giving the benefit of all reasonable doubts and inferences to the nonmoving party. *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 8, 177 Vt. 215, 862 A.2d 251. As plaintiffs point out, the trial court cannot resolve disputed issues of material fact in ruling on a summary judgment motion. See *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 211, 790 A.2d 408, 417 (2001). Rule 56 requires, however, a party to submit a statement of the material facts for which the party contends there is "no genuine issue to be tried" and the opposing party to specifically controvert any facts it disputes. V.R.C.P. 56(c)(2). Thus, even if the parties do not stipulate to facts, the submissions allow the trial court to determine which facts are uncontroverted and to render summary judgment on those facts if appropriate. The superior court followed that procedure in the current case. Specifically, we find that the trial court did not make any findings of disputed facts, and, on review, we do not have to make any findings on disputed facts in order to rule as a matter of law.

¶ 20. The first issue on appeal is whether plaintiffs can maintain their claim for damages from their physical and emotional injuries. The trial court determined that those claims were barred by the applicable statute of limitations, which requires claims for "injuries to the person" to be brought within three years after the cause of action accrues. 12 V.S.A. § 512(4). The statute of limitations issue is a question of law, and both parties agree that there are no genuine issues of material fact to prevent our reaching this legal question. For the reasons explained below, we agree that, to the extent plaintiffs seek physical and emotional damages, their claims are time-barred.

¶ 21. For several of their claims, plaintiffs seek damages for emotional distress and "mental suffering," and for the physical pain and suffering Ms. Gettis experienced as a result of her arthritic flares. Regardless of the characterization of a cause of action, claims for damages resulting from mental anguish, emotional distress, and personal humiliation are considered "injuries to the person" for purposes of the statute of limitations. *Fitzgerald v. Congleton*, 155 Vt. 283, 291, 583 A.2d 595, 600 (1990). Plaintiffs do not contest the application of the three-year statute of limitations to their claims for injuries to the person. They filed this suit in Windsor County Superior Court on December 12, 2001, so the claims must have accrued on or after December 12, 1998.

¶ 22. Generally, the statute of limitations begins to run at the point when a plaintiff has a cause of action. *Rennie v. State*, 171 Vt. 584, 586, 762 A.2d 1272, 1275 (2000) (mem.). In personal injury claims governed by 12 V.S.A. § 512(4), the cause of action accrues at the time a plaintiff discovers or reasonably should have discovered the basic elements of a cause of action, including the existence of an injury and its causes. *Lillicrap v. Martin*, 156 Vt. 165, 175, 591 A.2d 41, 46 (1989). This "discovery rule" is meant to prevent the injustice of barring a plaintiff from a deserved remedy simply because a plaintiff may not have been aware of his or her "legal injury" for a considerable time after the events that caused the harm occurred. There is no allegation here that plaintiffs' injuries were undiscovered until a time within the three-year limitations period. Plaintiffs had knowledge of their claims for personal injuries prior to December 12, 1998. They have presented evidence which shows they were aware of an injury as early as October 1997 when Ms. Gettis was hospitalized, and by at least January 1998, they had causally connected the injuries to the stress of their failing business. Thus, under our general statutes of limitation law, including the discovery rule, plaintiffs' claims for personal injury damages are time-barred.

¶ 23. Plaintiffs attempt to save their claims for personal injury damages by urging the Court to adopt a "continuing tort" rule. The continuing tort doctrine allows a plaintiff to support his or her cause of action with events that occurred outside of the limitations period by delaying the accrual of a claim until "the date of the last injury or the date the tortious acts cease." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003).

¶ 24. We have never adopted the continuing tort doctrine, although we indicated a variation of it may exist for discrimination cases in *Lee v. University of Vermont*, 173 Vt. 626, 626-27, 800 A.2d 444, 445-46 (2002) (mem.). In *Lee*, plaintiff claimed that the University discriminated against him when it classified him as dismissed for inadequate academic performance although he was actually on medical leave. We reversed the trial court's grant of summary judgment because there was a genuine issue of material fact as to whether plaintiff had applied for readmission after his dismissal. *Id.* If he had reapplied, he might have established a "continuing violation" that *might* have brought his claims within the limitations period, but we did not reach the issue. *Id.*

■ ¶ 25. We need not determine whether we would adopt the continuing tort doctrine to determine statute-of-limitations accrual outside of discrimination cases because it would not help plaintiffs in this case. The continuing tort doctrine requires at least two elements: a continuing wrong, and some action contributing to the wrong that occurred within the limitations period. Even if plaintiffs are correct that defendants' actions could be considered to be a continuing wrong, we can find no part of that wrong that occurred in the limitations period.

¶ 26. Plaintiffs allege the following actions in an effort to demonstrate that defendants engaged in an "ongoing pattern of tortious conduct," which caused plaintiffs' personal injuries:

- *December 10, 1996*: Defendants closed on plaintiffs' loans before the required permits were secured.
- *January 1997*: The GMEDC loan administrator advised plaintiffs to purchase business equipment with personal credit cards, and assured them that a lower-interest loan would be available that would relieve them of the high-interest credit card debt.
- *March 27, 1997*: The loan administrator informed plaintiffs that GMEDC would not provide plaintiffs with a loan to consolidate their credit card debt. She suggested that funds might be available in six months, but that in the meantime they should restructure the ownership of the business and solicit credit denials from other lenders.
- *October 3, 1997*: Mr. Gettis met with the loan administrator and SBA advisor, both as GMEDC representatives, who informed him that no additional loan funds would be provided under the existing loans and plaintiffs would have to begin the application process again if they sought additional loans.

- *October 1, 1998*: GMEDC executive director met with plaintiffs and was "furious" about their use of credit cards. He agreed to allow plaintiffs to make interest-only payments over the winter.
- *November 3, 1998*: The executive director sent a letter informing plaintiffs that they were required to bring their loans current before they could commence interest-only payments.
- *December 1, 1998*: Appellees sent default letters to plaintiffs, demanding payment of the loans in full within fifteen days — that is, before December 16, 1998.

The only act plaintiffs can point to within the limitations period is the expiration of the fifteen-day redemption period — or grace period, as plaintiffs characterize it — to cure the loan default. Plaintiffs contend that during this time defendants could have discontinued the default declaration or provided plaintiffs with an alternate means of meeting their obligations.

¶ 27. Nothing in the factual statements indicates that defendants took any action to collect on the loan obligations after plaintiffs defaulted. The complaint states that since plaintiffs had no "other financial options," they "regrettably shut their business down." In their supplemental statement of material facts, plaintiffs asserted that at no time after the default letter did any representative of defendants contact plaintiffs "to discuss their situation." The complaint goes on to state that plaintiffs were forced to file for bankruptcy and "also surrendered possession of the restaurant equipment and other property purchased with their personal credit cards." Consistent with that allegation, plaintiffs' supplemental statement of material facts states that after plaintiffs' delicatessen closed, defendants did not repossess any of the collateral and received no further payments on their loans.

¶ 28. The continuing tort doctrine requires that a tortious act — not simply the continuing ill effects of prior tortious acts — fall within the limitation period. See *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999); *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981); *Maslauskas v. United States*, 583 F. Supp. 349, 351 (D. Mass. 1984); *Feltmeier*, 798 N.E.2d at 85; *Jackson Cty. Hog Producers v. Consumers Power Co.*, 592 N.W.2d 112, 116 (Mich. Ct. App. 1999). The necessary tortious act cannot be the failure to right a wrong committed outside the limitation period. See *Fitzgerald v. Seamans*, 553 F.2d 220, 230 (D.C. Cir. 1977). If it were, the tort in many cases would never accrue because the defendant could undo all or part of the harm.

¶ 29. Here, plaintiffs identify no acts of defendants that occurred within the limitation period. Instead, they identify the failure to act — that is, the failure to rescind the default during the fifteen-day payment period. We note, however, that the declaration of default could have been waived even after the payment period and did not itself inflict an additional injury on plaintiffs. Indeed, we question whether the default declaration itself could be characterized as a tortious act rather than an effect of plaintiffs' financial situation caused, in plaintiffs' view, by defendants' acts. Because defendants committed no tortious act within the limitation period, plaintiffs' claims for personal injury damages would be barred even if we adopted the continuing tort doctrine.

¶ 30. The second issue involves plaintiffs' claims for economic damages. The superior court also ruled that these could not be maintained, but for a different reason. Defendants' expert, an economic consultant, concluded in his report that plaintiffs' business had failed because its revenues were well below expectations and not because of the credit card debt. Based on that report, which was not directly controverted by plaintiffs,[2] the court concluded that plaintiffs were unable to show a causal link between their legal theories and their injury, and granted summary judgment on that basis. The court reached that result for counts one through five of plaintiffs' complaint, but we see no reason why it does not apply to all eight counts. Although the counts express various contract and tort theories, they are all based on the common allegation that plaintiffs' business failure and resulting damages were caused by defendants' direction, through their agent, to incur credit card debt to open the delicatessen, followed by the failure to extend additional credit to pay the credit card debt and reduce the interest rate.

¶ 31. Defendants' summary judgment position was that plaintiffs could not establish causation. See *B.B. & J. v. Bedell*, 156 Vt. 203, 205, 591 A.2d 50, 51-52 (1991) (where plaintiff claimed that business failure was due to lessor's failure to supply potable water, it had the burden to

---

[2] Plaintiffs also offered a report of an expert witness to show how much profit plaintiffs could have been expected to make had they opened the business as originally proposed to GMEDC and received the forecasted revenue. This report was relevant, if at all, only if plaintiffs could have established that defendants caused their business to fail. Thus, plaintiffs' expert did not directly rebut defendants' expert and, as we explain in this opinion, the testimony was immaterial because plaintiffs cannot prove that defendants were the cause of plaintiffs' failed business.

prove causation). That position was based on a report of defendants' expert witness, economist Richard Heaps. The Heaps report — based upon plaintiffs' tax returns from 1997 and 1998, an accountant's report from 1997, and plaintiffs' 1999 bankruptcy filing — showed that plaintiffs' business had failed because of insufficient revenues, and would have failed even without the additional credit card debt.[3] The witness calculated plaintiffs' cash inflows and outflows, including both personal and business expenses.[4] The economist made his conclusions after "excluding all payments that could have been associated with additional borrowing costs." He determined that "after two years [plaintiffs] would have had a cumulative personal deficit of $29,073." Thus, in the economist's view, even if everything had gone as planned without the additional credit card costs, plaintiffs still would have incurred a deficit of nearly $30,000 over the initial two-year period.

¶ 32. Defendants also emphasize that the economist's report overstated the impact of the credit card debt because it did not include the carrying costs of an additional $22,000 loan. They argue that the deficit figure was too low because it assumed that the original loans would have paid for all renovation and equipment, whereas the reality was that additional financing was necessary to pay for the equipment. They argue that if defendants had granted the loan plaintiffs argue they should have granted, plaintiffs would have had to pay an annual debt service of at least $5,609, bringing their cumulative two-year deficit to over $40,000.

¶ 33. Whether plaintiffs' theory was based on tort or contract, they still had to establish that the damages that they claimed were caused by defendants' unlawful activities. Thus, for their tort claims, plaintiffs had to show "reasonable certainty or a reasonable probability that the apprehended future consequences will ensue from the original injury. Consequences which are contingent, speculative, or merely possible [are not included]." *Howley v. Kantor*, 105 Vt. 128, 133, 163 A. 628, 631 (1933); see also *Callan v. Hackett*, 170 Vt. 609, 609, 749 A.2d 626, 628 (2000) (mem.) (tort damages must be the "direct, necessary,

---

[3] There is a dispute over the amount plaintiffs charged to their credit cards. Plaintiffs claimed that the amount was over $22,000, but defendants' expert could identify only about $7,000. The difference in the amount of principal is irrelevant because plaintiffs argued that the interest and bank charges resulted in their failure, not the principal amount.

[4] Gettis, Inc. is an S-corporation, and as such its finances are tied to the owners' personal finances. H. Henn & J. Alexander, Laws of Corporations § 76, at 135 (3d ed. 1983).

and probable result" of defendant's tortious act); *My Sister's Place v. City of Burlington*, 139 Vt. 602, 612, 433 A.2d 275, 281 (1981). For their contract claims, plaintiffs had to show that their damages were reasonably certain and foreseeable and were reasonably within the contemplation of the parties at the time in which they entered into the contract. See *Wyatt v. Palmer*, 165 Vt. 600, 602, 683 A.2d 1353, 1357 (1996) (mem.); *Pareira v. Wehner*, 133 Vt. 74, 78-79, 330 A.2d 84, 86-87 (1974).

¶ 34. While plaintiffs might have claimed minor damages — for example, for the extra interest paid to the credit card companies — their overall claim was that the failure of the business and its consequences was caused by defendants' breach of contract and tortious conduct.[5] As the superior court held, defendants' expert testimony went directly to plaintiffs' central claim and showed it to be false. Without response, plaintiffs could not show that they could prevail on their claims.

¶ 35. Plaintiffs make several arguments attacking the expert's evaluation. Their main response is to claim that their other reasons for the failure of the business are related to the assumption of the credit card debt, and not independent of it, so they can still prove causation despite the simplistic analysis of defendants' expert witness. Plaintiffs cite particularly to three reasons which they claim are related to the assumption of the credit card debt: (1) the assumption of the credit card debt made plaintiffs financially vulnerable and dependent on defendants and severely damaged their creditworthiness; (2) defendants' actions caused plaintiffs to open their business in the slowest period of the season when their revenue was the lowest; and (3) the deterioration in the health of Patricia Gettis prevented her from improving the delicatessen business. The trial court responded to this argument with the conclusion "that it relies entirely on allegations and arguments, without citations to evidence" and that plaintiffs needed an expert witness to respond to defendants' expert witness.

¶ 36. We do not reach the superior court's conclusion that plaintiffs had to produce expert testimony to refute that offered by defendants. We agree with the court's conclusion that plaintiffs failed to respond to defendants' expert evidence. Plaintiffs' first example of a reason why the business failed demonstrates why their response was inadequate.

---

[5] Plaintiffs have not argued that the case should go forward solely so that they can claim the extra interest that they paid as a result of defendants' breach of contract and tortious acts.

Plaintiffs did not identify any lender who would have provided a consolidation loan had they not been burdened by credit card debt, nor did they identify how, if at all, their future creditworthiness affected the failure of the business. In fact, the evidence showed that they had unsuccessfully sought credit from other sources *prior* to obtaining the loans from defendant. Indeed, the apparent point of the government lending programs defendants implemented was to provide credit where normal commercial lenders would not. Thus, their claim that other lenders might have provided a consolidation loan if the credit card debt did not exist is mere speculation.

¶ 37. Plaintiffs' second reason for their business failure, that the business opened during a slow period, is also only a speculative claim, especially because defendants' economic expert analyzed the business based on two years of operation. Whether plaintiffs would have generated more annual revenue if they had opened at a different time is entirely speculative when looking at the record on summary judgment. Moreover, apart from plaintiffs' conjecture in argument, nothing in the evidence suggests that plaintiffs, who needed income, did not seek to open as soon as possible.

¶ 38. The third reason for which plaintiffs suggest their business failed is superficially related to the expert witness's conclusion that the business failed because it did not generate enough income. Plaintiffs claim that Patricia Gettis's health deterioration prevented her from improving the delicatessen business. Patricia Gettis lost two five-day periods of work because of her hospitalization. In general, however, the evidence showed that she refused to curtail her long work hours, despite advice from her doctor to do so, to attempt to improve her medical condition. Nothing in the evidence suggested that her medical condition prevented her from doing the necessary work to meet customer demand. Further, plaintiffs offered no evidence to show what plaintiffs would have done differently to generate more income. Thus, whether Patricia Gettis's medical condition contributed to the failure of the business is wholly speculative.

¶ 39. Plaintiffs' other objection to the expert's report is that the analysis involved the personal financial status of plaintiffs, as well as the corporation, Gettis, Inc. In fact, the report showed that Gettis, Inc. made a small amount of money in each of the years of its operation after paying a salary to James Gettis of between $14,000 and $15,000 in 1997 and 1998. The problem was, however, that plaintiffs were spending more than the small amount they were making.

¶ 40. The expert's report looked at both the corporate and personal circumstances of the Gettises because Gettis, Inc. was a subchapter S corporation in which earnings passed through the corporation directly to the owners. See *supra* ¶ 31 n.4. Subchapter S tax status was, however, only one of many reasons to look at both the personal and corporate financial circumstances together. The case was brought by the Gettises, not Gettis, Inc., based on their economic damages. The Gettises were personally obligated to repay the loans to defendants. When they ran into financial problems, they stopped paying on those loans, inducing the declaration of default. Plaintiffs' theory centered upon the alleged forced use of their personal credit cards. We thus see no error in judging causation in relation to the combined financial position of Gettis, Inc. and plaintiffs.

¶ 41. Finally, on this issue, plaintiffs argue that this case is governed by *Stacy v. Merchants Bank*, 144 Vt. 515, 482 A.2d 61 (1984), which holds that a business owner denied a promised loan is entitled to have his or her consequential damages determined by a jury. *Stacy* has, however, limited applicability here, and does not stand for the claimed proposition. In *Stacy*, a dairy farmer was promised a loan by defendant bank to cover the period between the date that the Farmers Home Administration made a commitment to extend financing to plaintiff and the date the money actually arrived. After defendant reneged on the loan commitment, plaintiff went out of business and sued for his "unrecoverable investment" in the farm. We announced a general rule that:

> Where a contract involves a promise to lend money, the law presumes that alternative financing is always available on the open market; therefore, recovery for a breach will often be limited to the cost of obtaining the promised amount elsewhere. . . . The above authorities are in accord, however, that if the borrower is unable to obtain alternative funds at the time of the breach, the lender will be liable for such actual damages incurred by the borrower as were reasonably foreseeable at the time the contract was made.

*Id.* at 520, 482 A.2d at 64 (citations omitted).

¶ 42. The general rule of *Stacy* is of no help to plaintiffs. Assuming that we should view this case as one in which alternative financing is

unavailable,[6] the question is what "actual damages" plaintiffs can prove were within the parties' contemplation and were reasonably certain. To the extent *Stacy* answers that question, the answer does not support plaintiffs' position. As in this case, the plaintiff in *Stacy* overclaimed his compensable damages seeking "all labor and material costs incurred in the preparation of the farm prior to purchasing the cows, as well as all of his operating expenses, minus income, incurred during the short life of the farm." *Id.* at 518, 482 A.2d at 63. We reversed a jury verdict allowing these damages, holding that plaintiff could recover only those expenses incurred in reliance upon receipt of the loan when established with reasonable certainty. *Id.* at 522, 482 A.2d at 65. In any event, *Stacy* does not support plaintiffs' argument that they are entitled to have their damages determined by a jury when we find as a matter of law that those damages are not shown with reasonable certainty.

¶ 43. We concur with the superior court that there is no disputed issue of material fact relevant to whether plaintiffs can recover economic damages on any of their theories. In light of defendants' uncontroverted expert evidence, we also agree that as a matter of law plaintiffs cannot recover economic damages. This holding applies to all counts of plaintiffs' complaint.

¶ 44. Since plaintiffs can recover neither economic nor noneconomic damages, the superior court was correct in awarding summary judgment on all counts for defendants. Because of our disposition, we do not reach the other issues decided by the superior court and briefed by the parties.

*Affirmed.*

---

[6] Without attempting to decide the validity of this assumption, we note that plaintiffs had alternative financing through their credit cards.