STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re Sheffield Wind Project | } | Docket No. 252-10-08 Vtec |
| (Appeal of Brouha et al.) | } |  |
|  | } |  |

Decision and Order on Pending Motions

Appellants Carol Brouha, Paul Brouha, Greg Bryant, Don Gregory, the King George School, Linda Lavalle, Jane Rollins, Robert Tuthill, and David Zimmerman initially appealed from a decision of the Vermont Agency of Natural Resources (ANR) issuing individual stormwater discharge permit (No. 5535-INDC), covering the construction of the Sheffield Wind Project in Sheffield, Vermont. In late May of 2009, Appellants filed a notice of appeal from the amended individual stormwater discharge permit (No. 5535-INDC.A) for the same project. The parties agreed that the amended permit superseded the original one, and that it would be most efficient to incorporate the appeal of the amended permit in the ongoing case, allowing the parties to supplement their motion memoranda to address all issues from both appeals that still pertain to the amended permit

Appellants are represented by Stephanie J. Kaplan, Esq.; Appellee-Applicants Signal Wind Energy, LLC and Vermont Wind, LLC are represented by Ronald A. Shems, Esq., Andrew N. Raubvogel, Esq., and Geoffrey H. Hand, Esq. The Vermont Agency of Natural Resources is represented by Judith L. Dillon, Esq. Appellee-Applicants have moved to dismiss certain questions in the statement of questions. Both parties have moved for summary judgment. The facts stated in this decision are undisputed unless otherwise noted.

1

<u>Standards Applicable to the Present Motions</u>

Summary judgment is appropriate "only where, taking the allegations of the nonmoving party as true, it is evident that there exist no genuine issues of material fact and the movant is entitled to judgment as a matter of law." <u>Fritzeen v. Trudell Consulting Engineers</u>, 170 Vt. 632, 633 (2000) (mem.). When presented with cross-motions for summary judgment, the Court considers each motion independently and "afford[s] all reasonable doubts and inferences to the party opposing the particular motion under consideration." <u>In re Chimney Ridge Road Merged Parcels</u>, No. 208-9-08 Vtec, slip op. at 2 (Vt. Envtl. Ct. July 31, 2009) (Durkin, J.) (citing <u>DeBartolo v. Underwriters at Lloyd's of London</u>, 2007 VT 31, ¶ 8, 181 Vt. 609).

In considering a motion for summary judgment, the trial court's function is "not to make findings on disputed factual issues." <u>Blake v. Nationwide Ins. Co.</u>, 2006 VT 48, ¶ 21, 180 Vt. 14; <u>Gettis v. Green Mountain Economic Development Corp.</u>, 2005 VT 117, ¶ 19, 179 Vt. 117. In the context of summary judgment, the court does not adjudicate the credibility of the parties or their witnesses or the weight of the facts offered through the affidavits submitted on summary judgment. <u>Provost v. Fletcher Allen Health Care, Inc.</u>, 2005 VT 115, ¶ 15, 179 Vt. 545 (stating that summary judgment is not warranted simply because a movant offers facts that appear more plausible than those tendered in opposition, or if the opposing party appears unlikely to prevail at trial.)[1]

Trial courts are cautioned that summary judgment "is not a substitute for a determination on the merits, so long as evidence has been presented which creates an issue of material fact, no matter what view the court may take of the relative weight of that evidence." <u>Fritzeen</u>, 170 Vt. at 633 (internal citation omitted).

---

[1] No responses to requests to admit have been submitted in the present case. See <u>Gallipo v. City of Rutland</u>, 2005 VT 83, ¶¶ 20–22, 178 Vt. 244 (citing <u>Freed v. Plastic Packaging Materials, Inc.</u>, 66 F.R.D. 550, 552 (E.D. Pa. 1975) (facts in a request to admit that are deemed admitted become undisputed and can serve as a basis for summary judgment).

In interpreting and applying administrative rules or regulations, such as the provisions of the Vermont Water Quality Standards (VWQS) at issue in this case, the Court approaches regulatory construction in the same manner as statutory interpretation. In re Williston Inn Group, 2008 VT 47, ¶ 14, 183 Vt. 621 (citing Conservation Law Found. v. Burke, 162 Vt. 115, 121 (1993)). The Court's "overall goal is to discern the intent of the drafters," first and foremost "by reference to the plain meaning of the regulatory language." Id. (citing Slocum v. Dep't of Soc. Welfare, 154 Vt. 474, 478 (1990)). The other tools of statutory construction are also available "should the plain-meaning rule prove unavailing." Id.

Section 1-05 of the Vermont Water Quality Standards also addresses the issue of their interpretation. That provision recognizes that ordinarily the Secretary of the ANR will apply and interpret the regulations in permit proceedings, but specifically states that:

> [w]here a de novo appeal is taken from the Secretary's decision, the appellate decision-maker must make determinations and interpretations under these rules to achieve the purposes of both state and federal law. The decision-maker in a de novo appeal is not bound by any determinations or interpretations of these rules made by the Secretary relative to an application, provided that review of such determinations is within the scope of the appeal.

VWQS § 1-05 (emphasis added).

Although the Court is not bound by the Agency's determinations or interpretations of the VWQS "relative to [a particular] application," as in In re: Unified Buddhist Church, Inc., No. 253-10-06 Vtec, slip op. at 3 (Vt. Envtl. Ct. Jan. 25, 2008) (Wright, J.), "deference is to be given to the interpretation of regulations and to the construction of a statute by the agency responsible for its execution." Id. (citing In re Appeal of Electronic Industries Alliance, 2005 VT 111, ¶7, 179 Vt. 539).

References to the Numbering of Questions in the Statements of Questions

Unfortunately, Appellants did not use a consistent numbering system between the statement of questions pertaining to the original permit (Statement of Questions filed January 5, 2009) and the statement of questions pertaining to the amended permit (Statement of Questions filed June 18, 2009). This decision will refer to the questions from the June Statement of Questions simply as "Question #," and will refer to any distinctions between the questions from the January and June Statements of Questions as "January Question #" or "June Question #," as necessary to minimize confusion.

Issues That Are Moot or Otherwise Have Been Resolved

January Question 2, regarding the project's compliance with the provisions of federal regulation 40 CFR § 131.12, was not included in the June Statement of Questions. Accordingly, Applicants' motions to dismiss or for summary judgment as to that question are moot. Question 2 from the January Statement of Questions is not an issue in the appeal from the amended permit, and will not be further discussed.

January Question 13, regarding whether the project's "plan to bury 3.1 miles of electricity collection cables complies with the acceptable practices in the Vermont Stormwater Management Manual," was withdrawn by Appellants on May 11, 2009. Given that Appellants did not contest Applicants' argument that the Stormwater Management Manual only applies to operational permits, and therefore does not apply to this construction permit, the reiteration of this question as June Question 12 seems to have been an inadvertent error. If it was intended to be included, summary judgment must be granted in favor of Applicants as to June Question 12 because Appellants have not put forth any evidence to contest Applicants' factual contentions on this issue, as required for summary judgment.

January Question 14, regarding whether Applicants "should be required to stabilize and protect from erosion and sedimentation all areas of earth disturbance

4

immediately in anticipation of storm events[,] and in any event within 24 hours," was not included in the June Statement of Questions. Accordingly, Applicants' motion for summary judgment as to that question is moot. Question 14 from the January Statement of Questions is not raised as a separate issue in the appeal from the amended permit, and will not be further discussed.

January Question 15 duplicated January Question 10; the June Statement of Questions eliminated the duplicate question and listed the issue as Question 9. Accordingly, any arguments originally submitted with reference to January Questions 10 or 15 will be addressed in this decision with respect to June Question 9.

January Question 16, regarding whether Applicants "can demonstrate that construction of the project will create no adverse impact to the Class III wetlands on the site," as well as to all surface waters in the state, was not included in the June Statement of Questions. Accordingly, Applicants' motions to dismiss or for summary judgment as to that question are moot. Question 16 from the January Statement of Questions is not an issue in the appeal from the amended permit, and will not be further discussed.

June Question 5 (January Question 6), regarding any earth disturbance associated with modifications to access roads off the site, has also become moot. The off-site road improvements (other than improvements to Duck Pond Road along the frontage of the project property, which are in fact addressed in the permit) are the subject of a separate authorization (NOI Authorization 5535-9020.2) under General Permit 3-9020, which has become final without appeal, rendering Question 5 moot. Moreover, Appellants have not cited any section in the applicable statutes or regulations that would require off-site work to be covered by the same stormwater construction permit that covers the on-site construction work for this project.

Prior to submission of the June Statement of Questions, while only the January Statement of Questions was pending, Appellants moved to amend January Question 8 to clarify that the question related to the compliance of the project's Erosion Prevention

5

and Sediment Control Plan with the state Standards and Specifications for Erosion Prevention and Sediment Control. The equivalent question in the June Statement of Questions, Question 7, contains the clarification. Accordingly, to the extent necessary, Appellants' motion to amend January Question 8 is granted. However, as discussed above, the appeal will proceed as to the amended permit under the June Statement of Questions, and the Question will be addressed in this decision with respect to June Question 7.

Issue Preclusion from PSB Decision

Applicants argue that June Questions 1, 2, and 3 have been conclusively resolved by the Public Service Board's (PSB) decision regarding the project's Certificate of Public Good,[2] and therefore those issues are barred by the doctrine of issue preclusion.

Issue preclusion, or collateral estoppel, bars relitigation of an issue that has already been litigated and decided. Trickett v. Ochs, 2003 VT 91, ¶ 10, 176 Vt. 89. Issue preclusion is appropriate where: "(1) preclusion is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) applying preclusion is fair." In re Hartland Group North Ave. Permit, 2009 VT 92, ¶ 7 (citing Trickett, 2003 VT 91, ¶ 10).

Administrative decisions, like those made by the Public Service Board, "can have preclusive effect in judicial proceedings when the administrative body has acted in a judicial capacity, resolving disputed issues of fact, and providing the parties with an adequate opportunity to litigate." In re Hartland Group, 2009 VT 92, ¶ 8 (citing Trickett, 2003 VT 91, ¶ 11). However, that does not hold true in this instance.

---

[2] On August 8, 2007, the Vermont Public Service Board, pursuant to 30 V.S.A. § 248, issued a Certificate of Public Good authorizing the construction of the Sheffield Wind Project.

Ridge Protectors, Inc. was a party to the PSB's Certificate of Public Good proceedings. Although some, but not all, of the Appellants were members of or active in Ridge Protectors, Inc., Applicants have not shown that the parties were sufficiently the same or that there was a full and fair opportunity to litigate the issues raised in this appeal. In particular, five of the Appellants in this case were not members of Ridge Protectors, Inc., and therefore were not parties or members of a party before the PSB.

Furthermore, there was not a full and fair opportunity to litigate the issues raised in this appeal. In particular, the applicability of the presumption of compliance found under 10 V.S.A. § 1246 and the overall effect that presumption has on compliance with the VWQS as a whole, including the anti-degradation policy, were issues not before the PSB. Accordingly, Applicants motion to dismiss based on the doctrine of issue preclusion must be denied.

Motion for Summary Judgment as to Question 4

Question 4 relates to whether there will be discharges to tributaries of streams over 2,500 feet in elevation, and, if so, whether the application complies with the Vermont Water Quality Standards (VWQS)[3] § 1-03(C) as to such waters, which are classified as Class A under 10 V.S.A. § 1253.

The permit does not authorize any discharges above 2,500 feet in elevation. It is undisputed, however, that elements of the project will be constructed above 2,500 feet in elevation. Applicants claim that there will be no discharges into waters above 2,500 feet despite the construction above this elevation. However, Appellants raise a disputed issue of fact as to whether a discharge from the construction of a project

---

[3] The parties did not provide a copy of the Vermont Water Quality Standards; the Court has used the electronic version of the VWQS available at: http://www.nrb.state.vt.us/wrp/publications/wqs.pdf.

element at 2,535 feet will occur.  Because this fact is disputed, summary judgment is not appropriate.

Motion for Summary Judgment as to Question 6

Question 6 relates to whether the proposed culvert replacement and the installation of new culverts must be reviewed as part of the application for this permit. The parties do not dispute that the proposed culvert replacement and installation of new culverts were in fact reviewed as part of the application for this permit.  Question 6 is therefore resolved in the affirmative by summary judgment.

Motion for Summary Judgment as to Question 8

Question 8 relates to whether the On-Site Plan Coordinator required by the permit should be "independent" rather than "under the control of" the Applicants.  The Amended Permit, as well as the statute and regulations, provides for ANR inspection and monitoring as well as the oversight provided by the On-Site Plan Coordinator and the EPSC Specialist.  In addition, the ANR has independent inspection and investigation authority under 10 V.S.A. § 8005.  Appellants have not shown as a matter of law that requiring or allowing the On-Site Plan Coordinator to be selected by Applicants will cause the project to violate the VWQS.

Motion for Summary Judgment as to Question 9

Question 9 asks whether the permit must provide for "public involvement in monitoring compliance and in enforcing permit conditions."  Appellants, like any members of the public, are entitled to public access to all monitoring reports and records.  The federal statute, 33 U.S.C. § 1251(e), requires public participation in the "development, revision, and enforcement" of regulations, standards, effluent limitations, plans, and programs.  It does not on its face provide for public participation

8

in monitoring, nor is such a provision found in state statute or regulations. Because 33 U.S.C. § 1251(e) does require public participation in enforcement, it would be up to other appropriate proceedings to determine if the prerequisites for a federal Clean Water Act citizen suit are met, in the absence of such state provisions. As in <u>ANR v. Montagne & Branon</u>, No. 291-12-07 Vtec, slip op. at 10 (Vt. Envtl. Ct Apr. 9, 2008) (Durkin, J.), it is not for this Court to create a provision that does not exist in state statutes or regulations.

Motion for Summary Judgment as to Question 10

Question 10 asks whether Applicants should be required to post a bond to ensure that remediation and restoration funds will be available in the event that discharge from the construction of the project results in significant damages. Unlike under other environmental statutes, such as Act 250,[4] or the Waste Management statute,[5] Appellants have cited no specific statutory authority under the Water Pollution Control statute to require a bond as a condition of permit approval.

However, at this time it would be an impermissible advisory opinion to determine whether a bond could be required under the language that "the permit shall contain additional conditions, requirements, and restrictions as the secretary deems necessary to achieve compliance" with the VWQS. 10 V.S.A. § 1264(e), (h).

Motion for Summary Judgment as to Question 3

Under 10 V.S.A. § 1264(g)(1), "[i]n any appeal under this chapter an individual permit meeting the requirements of [10 V.S.A. § 1264(f), providing for, among other

---

[4] 10 V.S.A. § 6068(c) ("A permit may contain such requirements and conditions . . . including . . . the filing of bonds to insure compliance.").

[5] 10 V.S.A. § 6611(a) (operator of waste management facility "shall provide evidence of . . . financial responsibility" to cover remedial work upon closure of the facility).

things, best management practices or BMPs], shall have a rebuttable presumption in favor of the permittee that the discharge does not cause or contribute to a violation of the Vermont water quality standards for the receiving waters with respect to the discharge of regulated stormwater runoff." Under the final sentence of § 1264(g)(1), this presumption only applies to permits allowing discharge into impaired waters that are impaired for reasons other than regulated stormwater runoff.

Nevertheless, the presumption also applies to the permit at issue in this appeal by virtue of § 1264(g)(2), which applies the presumption to individual construction permits issued under the federal NPDES program,[6] and § 1264(h), which applies the presumption to unimpaired waters or "waters that meet the water quality standards of the state." See also Re: CCCH Stormwater Discharge Permits, Permit Nos. WQ-02-11, WQ-03-05, WQ-03-06, & WQ-03-07, Findings of Fact, Concl. of Law, & Order, at 27 (Vt. Water Res. Bd. Oct. 4, 2004).

Under both the federal Clean Water Act and Vermont law, discharge permits must comply with the VWQS. See 33 U.S.C. § 1313(a); 10 V.S.A. § 1264(e)(1). The Vermont Water Quality Standards include an anti-degradation policy in § 1-03.[7] Vermont's anti-degradation policy requires that "[e]xisting uses of waters and the level of water quality necessary to protect those existing uses shall be maintained and

_____

[6] However, the presumption applies to NPDES permits "only to the extent allowed under federal law." 10 V.S.A. § 1264(g)(2). For example, EPA has withdrawn approval for a provision of the VWQS, the limited duration activity (LDA) provision, as being inconsistent with federal law. See Letter from Stephen S. Perkins, Director, Office of Ecosystem Protection, U.S. EPA, to Peter Young, Chair, Vermont Natural Resources Board (July 11, 2007). Under the LDA provision, certain short-term exceedances of the VWQS associated with construction projects were permitted. EPA "disapprove[d] the LDA provision as being inconsistent with federal law . . . [because] that provision had the effect of allowing variances from water quality standards to be granted without the safeguards essential to be consistent with federal law." Id.
[7] See 40 C.F.R. § 131.6(d) (requiring states to include "[a]n antidegradation policy consistent with Section 131.12," which contains EPA's federal policy).

10

protected regardless of the water's classification."  VWQS § 1-03(B)(1).  Since the VWQS include the state's anti-degradation policy, the statutory presumption extends to a permittee's compliance with the anti-degradation policy.  See Re: CCCH at 40, n.10.

Because the presumption applies to VWQS § 1-03, in this appeal the Appellants bear the burden of rebutting the presumption that compliance with the permit will ensure that all VWQS standards have been met, including the anti-degradation policy's requirements that existing uses and water quality of the receiving waters will be maintained and protected.  10 V.S.A. § 1264(g), (h); Re: CCCH at 40, n.10. [8]

However, the conclusion that the presumption is applicable does not resolve the issue in Question 3 as to whether the baseline determination of existing uses and existing water quality is required, pursuant to VWQS § 1-03(B)(1).  Because the waters receiving discharge under this permit are high quality waters, § 1-03(C) requires that "such waters shall be managed to maintain and protect the higher water quality and minimize risk to existing and designated uses."

---

[8]  Section 1264(e) "requires that any permit issued for a new stormwater discharge by the Secretary of ANR must, at a minimum, be consistent with the 2002 [Stormwater] Manual, as amended from time to time, by rule."  Re: CCCH at 30.  Once it is shown that the permit is consistent with the Manual, which sets forth BMPs that can be used for a project, the presumption of compliance with all VWQS is applied.  Id.  The parties have not provided the documentation showing that the Vermont Standards and Specifications for Erosion Prevention and Sediment Control (Vermont EPSC Standards) have been adopted by rule as the Stormwater Manual for the construction phase of a project, but the ANR, which is charged with administering this program, states that to be the case in its memorandum.  If the Vermont EPSC Standards establish the BMPs for construction permits, as the 2002 Manual establishes the BMPs for operational permits, then consistency with the Vermont EPSC Standards for construction-phase permits creates the statutory presumption of compliance with all VWQS. See Vermont Agency of Natural Resources Opposition to Appellants' Motion for Summary Judgment, at 12 (Mar. 17, 2009).

While the rebuttable presumption establishes that the BMPs in place in the permit will achieve the requirements of § 1-03(C), that presumption can be rebutted by evidence brought forward by Appellants. However, an agreed or otherwise established benchmark of the existing uses and existing quality of the receiving waters is necessary against which to measure that evidence. Such a benchmark is also necessary to determine during the life of the permit whether the requirements of the permit and the anti-degradation policy are being met. See Amended Permit, § J.

The anti-degradation policy creates a three-tiered system of protection. See § 1-03(B)–(D); Re: CCCH at 39; In re: Stormwater NPDES Petition, No. 14-1-07 Vtec, slip op. at 16 (Vt. Envtl. Ct. Aug. 28, 2008) (Durkin, J.); see also 40 C.F.R. § 131.12. The first of these, § 1-03(B), requires that existing uses of all waters be maintained and protected, whether the waters are impaired or unimpaired, and lays out the factors to be considered in making the "existing uses" determination. Section 1-03(B) allows the determination of existing uses to be made either on a case-by-case basis during the permit process or during the basin planning process.[9] The third tier, § 1-03(D), protects "outstanding resource waters," not applicable to this appeal.

The second tier, found in § 1-03(C), addresses "Protection and Maintenance of High Quality Waters," which are waters "the existing quality of which exceeds any applicable water quality criteria." For such unimpaired waters, the anti-degradation policy requires that, except as provided in § 1-03(C)(2), "such waters shall be managed to maintain and protect the higher water quality and minimize risk to existing and designated uses." § 1-03(C)(1). Section 1-03(C)(2) allows a "limited reduction in the existing higher quality of such waters," under certain circumstances, but not so far as to jeopardize the maintenance of "the level of water quality necessary to maintain and protect all existing uses as well as applicable water quality criteria" required to be

---

[9] No party has argued that the determination of existing uses was done during a basin planning process in the present case.

maintained "in all cases" by the final sentence of § 1-03(C)(1). See also <u>In re: Stormwater NPDES Petition</u> at 16.

Thus, for such high quality waters, the plain language of the anti-degradation policy found in § 1-03(C) requires that the existing higher level of water quality be maintained, unless a § 1-03(C)(2) reduction in existing quality has been allowed. Even if a reduction is allowed, the plain language of the anti-degradation policy requires in all cases <u>both</u> that whatever level of higher water quality necessary to protect existing uses must be maintained <u>and</u> that the applicable water quality criteria in Chapter 3 of the VWQS must continue to be met.

Section 1-03 "does not include an implementation procedure explaining how and under what circumstances anti-degradation review of a proposed discharge [is to] be undertaken." <u>Re: CCCH</u> at 39. The VWQS do not define whether all discharges must undergo anti-degradation analysis, or "whether a distinction can be drawn between construction-phase and operational-phase discharges or between impaired and unimpaired receiving waters." <u>RE: CCCH</u> at 39–40. Until a rule or procedure is adopted that clarifies how the anti-degradation policy should be implemented and to which types of discharges it applies,[10] this Court can only determine what is required by the plain language of the statute and applicable regulations, including the VWQS, applying the recognized rules of statutory construction.

---

[10] The former Water Resources Board noted that "an anti-degradation implementation procedure . . . could help clarify when careful inventory and assessment of a receiving water's existing uses and the imposition of additional terms and conditions to monitor and modify projects to <u>assure</u> compliance with all provisions of the VWQS, not just numerical criteria, is required." <u>Id</u>. at 32 (emphasis in original). The Board expressed its concern over the potential "danger that water quality in . . . now <u>un</u>-impaired waters may be incrementally degraded over time if the . . . ANR relies solely on [the use of BMPs] to authorize additional new discharges of collected stormwater into these waters." <u>Id</u>.

13

Motion for Summary Judgment as to Question 7

Question 7 presents two separate issues. It first asks whether the Applicants' Erosion Prevention and Sediment Control Plan (EPSC Plan) complies with specific sections of the Vermont Standards and Specifications for Erosion Prevention and Sediment Control (Vermont EPSC Standards).[11] The specific sections of the Vermont EPSC Standards listed in Question 7 are Section A on page 3.7, Section 3 on page 3.8, and Section 3.3 on pages 3.19–3.21. Material facts are in dispute, or at least have not been provided to the Court, to allow the Court to determine whether the EPSC Plan complies with the EPSC Standards, as the Standards were not provided either electronically or in hard copy. See footnote 11 below.

Question 7 also asks whether, even if the EPSC Plan does meet the Vermont EPSC Standards, more stringent requirements should be imposed to meet the VWQS. Material facts are in dispute as to whether any more stringent requirements are necessary to meet the requirements of the VWQS. Appellants may present evidence at trial both directed at overcoming the presumption, and as to the merits of whether any more stringent requirement is necessary to meet any specific standard in the VWQS, as referenced in the more specific statement of Question 2 required below.

Motion for Summary Judgment as to Question 11

Question 11 relates to whether restrictions imposed by the permit on construction during the late fall/winter/spring period, which is a period defined as from

---

[11] The parties did not provide a copy of the Vermont Standards and Specifications for Erosion Prevention and Sediment Control. The Court attempted to access an electronic copy available at: http://www.anr.state.vt.us/cleanandclear/erosion.htm. However, the link provided brings up a notification that "this page cannot be found."

14

October 15 to April 15, should be extended to May 15 because of the high elevations and late spring snowmelt in the project area.

Material facts are in dispute as to whether the characteristics of the project area warrant extending the late fall/winter/spring period restrictions of § G(2) of the Amended Permit and of the Erosion Prevention and Sediment Control Plan to May 15. Those restrictions include the potential for the Secretary to suspend or prohibit construction activities if such construction "is determined to present a significant risk to water quality." Amended Permit, § G(2). Appellants may present evidence at trial both directed at overcoming the presumption, and as to the merits of whether extending this period to May 15 is necessary for compliance with the VWQS.

### Motions to Dismiss[12] or for Summary Judgment as to Questions 1 and 2

Appellee-Applicants are correct that the parties are entitled to "a statement of questions that is not vague or ambiguous, but is sufficiently definite so that they are able to know what issues to prepare for trial." In re Unified Buddhist Church, Inc. Indirect Discharge Permit, No. 253-10-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. May 11, 2007) (Wright, J.). Questions 1 and 2 pertaining to the Amended Permit are more specific than the corresponding questions relating to the original permit, but they are still too broad to allow the parties to prepare for trial.

On the other hand, to the extent that Questions 1 and 2 encompass the issues raised in the other questions in the Statement of Questions, material facts are in dispute at the present time to preclude summary judgment, except as to the following legal issue embedded in Appellants' Motion for Summary Judgment regarding the turbidity

---

[12] Applicants initially moved to dismiss January Questions 1, 2, 3, 4, and 16; January Questions 2 and 16 are no longer at issue in the present appeal. Therefore, only June Questions 1, 2, and 3 (formerly January Questions 1, 3, and 4) remain. Question 3 was addressed earlier in this decision.

15

standard in § 3-04(B)(1). Appellants have conflated the Amended Permit's 25 nepholometric turbidity units (NTU) limit for stormwater as it leaves the construction site with the § 3-04(B)(1) in-stream limit of 10 NTU. It will be for trial to determine whether or not the action level set for the runoff at the construction site is sufficient to achieve the in-stream turbidity standard.

Question 1 raises the project's compliance with 10 V.S.A. §§ [1251],[13] 1263, and 1264. From the totality of the filings submitted by Appellants, the Court cannot determine that Appellants actually challenge any aspects of the proposal's compliance with the Water Pollution Control statute, other than as raised by the more specific Questions 3 through 12, which have been addressed above. Accordingly, on or before October 9, 2009, Appellants shall file a more specific statement of Question 1, stating specifically if the issues raised as to the project's compliance with the three statutory sections are limited to those raised by the other questions in the Statement of Questions.

Question 2 raises the project's compliance with §§ 1-02, 1-03, 1-04, 3-01, 3-02, and 3-04 of the VWQS. From the totality of the filings submitted by Appellants, the Court cannot determine that Appellants actually challenge any aspects of the proposal's compliance with §§ 1-02, 1-03, or 1-04, other than as raised by the more specific Questions 3 through 12, which have been addressed above. As to the Water Quality Criteria found in §§ 3-01, 3-02, and 3-04, many of those criteria are inapplicable to the present proposal, but it is up to Appellants to specify which, if any, are the subject of the appeal. It is not for the Court or the other parties to make assumptions about which ones are of concern. Accordingly, on or before October 9, 2009, Appellants shall file a more specific statement of Question 2, stating specifically if the issues raised as to the project's compliance with §§ 1-02, 1-03, and 1-04 are limited to those raised by the other questions in the Statement of Questions, and, stating with specificity the subsections of

---

[13] There is no § 1250; § 1251 contains the statutory definitions.

16

§§ 3-01, 3-02, and 3-04 that are asserted to be at issue in this appeal, and on which Appellants propose to present evidence.

Appellee-Applicants' motions to dismiss Questions 1 and 2 are DENIED at this time, with leave to renew after the more specific filings have been made.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED as follows:

As discussed above, January Questions 2, 14, and 16, and June Questions 5 and 12, are moot. Appellee-Applicants' motions to dismiss Questions 1 and 2 are DENIED at this time, with leave to renew, as discussed above.

Summary judgment is DENIED as to Questions 1, 2, 4, 7, and 11, as material facts are in dispute. Summary judgment is DENIED as to Question 10, as it calls for an impermissible advisory opinion in the present posture of the case.

Summary judgment is GRANTED to both parties as to Question 6, in that the proposed culvert replacement and the installation of new culverts must be reviewed as part of the application for this permit, but also that the proposed culvert replacement and the installation of new culverts have in fact been reviewed in connection with the application for this permit.

Summary judgment is DENIED to Appellants, and is GRANTED to Appellee-Applicants, as to Questions 8 and 9.

Summary judgment is GRANTED in part to Appellee-Applicants as to Question 3, in that the rebuttable presumption of compliance with the VWQS applies to the anti-degradation policy components of the VWQS, but is GRANTED in part to Appellants as to Question 3, in that the existing uses, and the existing water quality (if higher than the VWQS), must be established in this case for the receiving waters at issue in this permit. Please be prepared to discuss at the scheduled conference this task and whether any facts are in dispute as to it.

This matter is set for trial on October 15 and 16, to continue on November 5 if necessary. Given those trial dates, ordinarily the Court would give the parties until approximately November 17 to file requests for findings and memoranda of law, and, given the Thanksgiving weekend, would give the parties until approximately December 1 to file any responses. Appellants have moved to extend the trial dates due to the timing of this decision on the pending motions. That motion will be argued and decided at the conference now scheduled for October 5 (see enclosed notice).

If the trial dates are extended, the Court will establish a schedule to avoid any corresponding delay in the issuance of the Court's decision, by requiring the parties' requests for findings and memoranda of law to be filed by November 17, and by requiring any responses and supplemental requests to be filed by December 1 or by three business days after the final trial date, whichever occurs later. At the conference already scheduled for October 5, 2009, the parties should be prepared to discuss the following dates, which are available in the Court's schedule: November 5 (already scheduled), 12*, 13, 19, and 20*, and December 2, 3, 4, 8, 9, and 10. The Court recognizes that the dates in November marked with an asterisk were not available in certain of the parties' calendars as of the date the trial was originally scheduled, but has listed them for the parties' information as being available in the Court's schedule.

Please be prepared to discuss which dates are available for specific witnesses, as the Court may schedule specific dates for witnesses on specific topics, including the use of some of the originally scheduled trial dates if appropriate. By the time of the October 5 conference, the Court should be able to advise the parties as to which of those dates are available in St. Johnsbury and which are available in Berlin.

Done at Berlin, Vermont, this 29th day of September, 2009.

_____
Merideth Wright
Environmental Judge

18