Bostock v. City of Burlington, No. S1337-03 CnC (Toor, J., Jan. 27, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
CHITTENDEN COUNTY

| | |
|---|---|
| MORTON BOSTOCK AND KATHRYN BOSTOCK<br> Plaintiffs<br><br> v.<br><br>CITY OF BURLINGTON<br> Defendant | SUPERIOR COURT<br>Docket No. S1337-03 CnC |

RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

In this case, now into its seventh year since the complaint was filed, Plaintiffs Morton Bostock and Kathryn Bostock sue the City of Burlington (the City) claiming an interest in an area of land (the "Subject Property") located north of their [address redacted] property (Counts I–V), and seeking damages for actions taken by the City which Plaintiffs allege constitute trespass, nuisance, and a breach of duty to provide lateral support (Counts VI–VIII). The City has filed two motions for partial summary judgment, the first of which addresses Plaintiffs' claims of trespass, nuisance, and lateral support, and the second of which addresses Plaintiffs' claims that they have an interest in the Subject Property.

Before delving into the background in this case, the court pauses to address a procedural issue. The City's two motions for partial summary judgment are each accompanied by a separate statement of material facts consisting of numbered

paragraphs, in most (but not all) cases with citations to the record. V.R.C.P. 56(c)(2). Plaintiffs have not filed statements of fact in response, but have instead filed a 52-page memorandum of law opposing summary judgment on Counts VI–VIII, and a 56-page memorandum of law opposing summary judgment on Counts I–V. Both of those memoranda contain a short "background" section with no citations to the record. The former memorandum is accompanied by exhibits, which the memorandum cites for certain factual assertions woven into the legal discussion. The latter memorandum contains no exhibits, but includes some allegations of fact woven into the legal discussion with no citations to the record, and some fairly lengthy block quotes of deposition testimony without any accompanying transcripts.

The City has noted that Plaintiffs have not submitted a statement of material facts, and contends that the City's material facts are deemed admitted because they are uncontroverted. City's Reply at 15 (filed May 22, 2009). The court generally agrees with the City on that point. See Webb v. LeClair, 2007 VT 65, ¶¶ 4–7, 182 Vt. 559 (mem.). However, some of the City's statements of fact are themselves problematic.[1] Nonetheless, even where the City's factual assertions are not properly supported as Rule 56 requires, Plaintiffs' failure to object on that basis or to counter the alleged facts will be

---

[1] As mentioned above, not all of the statements are properly supported with citations to the record. In addition, many of the statements say things like "Exhibit A is a letter from x to y" or "Exhibit B is a deposition of Mrs. Smith." These are not themselves material facts as contemplated by Rule 56, and are thus not very helpful to the court. Merely saying a document is what it is does not establish the facts contained in that document. If what the City intends is to establish a particular fact in a document, the appropriate procedure is to state the alleged undisputed fact (e.g., "Plaintiffs were aware as early as 1991 that . . . .") and then cite the document for support (e.g., "1991 letter from Plaintiffs to Mayor"). The referenced documents can be properly made a part of the record by admission of an affidavit from a person with knowledge such as a records custodian from the City.

2

deemed by the court a waiver of any objection thereto. Accordingly, the undisputed material facts for present purposes are as follows.[2]

Plaintiffs own property at [address redacted], Burlington, Vermont (the "Bostock Property" or the "Property"). The Bostock Property fronts on and has normal access to North Avenue, a public road. Plaintiffs moved into the single family residence on the Property in November 1976. At the time, the only structure on the Bostock Property was a single family home and there was no garage or paved driveway. Plaintiffs purchased the Property from Ada T. Beattie by warranty deed dated January 4, 1977. Ada T. Beattie was the widow of George Beattie and they owned the Property as joint tenants before George Beattie died.

Plaintiffs' complaint focuses on what they define as the "Subject Property," which they allege adjoins the Bostock Property and is described in the complaint as follows: "Property extending Northwest along North Avenue approximately sixty-two (62) feet to the North and one-hundred (100) feet to the Northeast parallel to the Plaintiff's [sic] [address redacted] property line and extending Southeast at ninety (90) degrees to join Plaintiffs' Northwest property line." Third Am. Compl. ¶ 3 (filed July 10, 2007). The City asserts that, prior to Plaintiffs' purchasing the Bostock Property in 1977, the City, with the permission of George Beattie, dumped tree debris and other fill material over the hillside bank of Arthur Park and the Property (the Stump Dump).[3] Plaintiffs allege that

---

[2] The court combines the undisputed facts into a single statement for the purposes of the pending motions. The court notes that the City's statements do not encompass all the facts material to the various legal issues presented. In some cases, where necessary to understand the parties' arguments, the court has included a fact clearly alleged in Plaintiffs' memorandum of law where there is support in the record. The court is mindful of the summary judgment standard throughout.

[3] The City cites the February 17, 2005 deposition of Burton Shangraw for this proposition, but the court cannot tell from the pages cited which property the hill was on. The court understands there was a hill "by" or near or possibly even on the Bostock Property, and that it was an accessible area. Shangraw Dep. 8:17–9:1, Feb. 17, 2005. It also appears that "[t]he City's property and the whole area was a dump area behind

3

George Beattie "entered into a verbal agreement with the superintendent of the Burlington Parks Department at that time, William Keogh, that allowed the Parks Department to use certain land north of the [address redacted] property in Burlington, including part of the subject property, for the dumping of tree removal debris." Third Am. Compl. ¶ 5 (filed July 10, 2007). In the spring of 1976, the debris caught fire and burned for several months.[4] The City fire department used water and ultimately explosives to extinguish the fire.

Plaintiffs allege that the back yard of the Property has been "slumping" ever since they purchased the Property, and that the slumping was caused by the fire and fire suppression efforts on the Subject Property.[5] A garage Plaintiffs built in 1989 settled differentially, and was reconstructed in 1999.[6] Since Plaintiffs purchased the Property, they have added fill in the area of their back yard—and, apparently, including the Subject

---

the garage and over on to the Beattie property was all a dumping, around the whole berm we were dumping around." Id. 67:1–4. Finally, it appears to the court that, due to the dumping, the contours of the hill as it was before any materials were dumped on it are now buried and unknown. See Ex. A to Pls.' Opp'n (filed Apr. 15, 2009) (which Plaintiffs say is the July 2007 "Geotechnical Engineering Report" of their expert, Gregory P. Gifford) ("[T]he actual topography of the pre dump hillside is not known."). This may be one reason for the boundary dispute discussed below.

[4] The record does not make clear how much debris had been dumped before it caught fire, but it appears that the City was disposing of many trees at the time due to Dutch Elm Disease. Shangraw Dep. 5:25–6:1, Feb. 17, 2005.

[5] This statement appears in the City's statement of material facts, and is supported by the deposition testimony of the Bostocks. The statement is also consistent with Plaintiffs' "background" statement and their expert's report. See Pls.' Opp'n (filed Apr. 15, 2009) ("Upon Defendant's extinguishing the fire with explosives and water, the subject property became extremely volatile and began to erode."); Ex. A to Pls.' Opp'n (filed Apr. 15, 2009) ("The introduction of 55 million gallons of water while trying to extinguish the fire could have resulted in erosion of native soils beneath and along side the debris field. This erosion could have steepened the native soil slope at the interface of the soil and the trees. The concern is that the steepening could have undercut soils that were supporting the foundation of the residence as it has done at the garage.").

[6] This fact does not appear in any of the City's statements, but it does appear in Plaintiffs' memorandum of law opposing summary judgment on Counts VI–VIII, and has support in the record. See Pls.' Opp'n at 17 (filed Apr. 15, 2009); Ex. A to Pls.' Opp'n (filed Apr. 15, 2009).

4

Property—to stabilize erosion.[7] Plaintiffs believe the value of these efforts to add fill is $70,000.00 to $80,000.00.[8] There was no written lease or license agreement authorizing this use of the Subject Property. However, in the summer of 1977, Morton Bostock arrived at a "verbal agreement" with Sid Baker, head of the City Parks Department, and with George Crombie, head of the City Street Department, under which Plaintiffs were permitted to, at their own expense, restore and maintain the Subject Property to curb erosion.[9]

The City maintains that the Subject Property is part of a city park called Arthur Park.[10] Plaintiffs do not deny the existence of Arthur Park, but say the deed conveying the land comprising Arthur Park does not make the boundaries clear. Plaintiffs further argue that, given the City's "longstanding acquiescence" to Plaintiffs' use of the Subject Property, the City has abandoned any plans for public use of the Subject Property. The City says that Arthur Park is intended to be used as a natural area.

On November 4, 1991, Plaintiffs wrote a letter to Thomas Racine, Chairman of the Public Works Commission of the City. In that letter, Plaintiffs expressed concern that the City was flooding the Bostock Property with water, pollutants, and sewage, and adding to the instability of the hillside bank by neglecting drainage and increasing water

---

[7] The record contains varying descriptions of how much fill was added, ranging from hundreds of truckloads to more than one thousand truckloads. Bostock Dep. p.51, Apr. 7, 2005; Bostock Dep. p.71, July 1, 2008.

[8] This fact does not appear in any of the City's statements, but it does appear in Plaintiffs' memorandum of law opposing summary judgment on Counts I–V, and has support in the record. See Pls.' Opp'n at 16 (filed June 26, 2009); Bostock Dep. p.52, Apr. 7, 2005.

[9] This fact does not appear in any of the City's statements, but it does appear in Plaintiffs' memorandum of law opposing summary judgment on Counts I–V, and has support in the record. See Pls.' Opp'n at 12–13 (filed June 26, 2009); Bostock Dep. pp.106–08, Apr. 7, 2005.

[10] The City asserts this fact without any citation to the record. See Defs.' Statement of Undisputed Material Facts ¶ 5 (filed Apr. 8, 2009).

levels. Plaintiffs expressed their belief that the water-related problems were caused by: (1) construction of the Route 127 beltline/northern connector in the 1970s; (2) construction of a wildlife sanctuary by damming of the Intervale in 1986; and (3) construction of a stormwater project. Also in the letter, Plaintiffs alleged that, since these three projects, "[a] bowl effect has been created" and their property is now flooded. They also alleged that "[t]he City has taken our land by flooding it with water."[11]

Although it is not clear from the record, it appears that at some point around 2003 Plaintiffs became concerned that the City might no longer allow them to add fill or undertake other erosion control measures on the Subject Property. That concern appears to be the genesis of this lawsuit.

## I. Plaintiffs' Alleged Interest in the Subject Property

Plaintiffs claim an interest in the Subject Property under a variety of theories. Plaintiffs do not claim to own the Subject Property by deed. The court takes each theory in turn.

### A. Irrevocable License (Easement by Estoppel) (Counts I and II)

Plaintiffs seek an irrevocable license so that they can use the Subject Property "solely for [the] purpose of protecting their home and family from the ever-present risks posed by a continually failing slope." Pls.' Opp'n at 25 (filed June 26, 2009). An irrevocable license, such as the one Plaintiffs claim they have, is a variety of easement. See Restatement (Third) of Property (Servitudes) § 1.2(4). "An irrevocable license is a license that becomes an easement by estoppel under the circumstances set forth in § 2.10,

---

[11] As best the court can tell, the problem Plaintiffs alleged in 1991 continues to exist today. See Pls.' Opp'n at 34 (filed Apr. 15, 2009) (characterizing their nuisance claim as "concerning the City's stormwater project and the presence of wetland on their Intervale land"); Pls.' Surreply at 16 (filed Sept. 1, 2009) (mentioning "the flooding on Plaintiffs' property").

6

Servitudes Created by Estoppel." Id. cmt. g. The requirements for creation of an easement by estoppel are, in pertinent part, as follows:

> If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when . . . the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief . . . .

Id. § 2.10. Although this principle is "flexible," the Restatement warns that "courts should be very cautious in establishing servitudes on the basis of estoppel because they tend to penalize neighborly cooperation, and they undercut the policies encouraging the use of written documents for land transactions." Id. § 2.10 cmt. c.

The City contends it should be granted summary judgment on this claim because: (1) under § 55 of the Burlington City Charter, interests in land owned by the City of Burlington may only be acquired, transferred or conveyed by action of the City Council and the Mayor, and (2) Plaintiffs cannot prove the elements of their claim.[12] See City's Motion at 4–8 (filed Apr. 8, 2009). The City's second argument on this point seems to be that the Burlington City Council never approved Plaintiffs' use of the Subject Property. See City's Motion at 6–8 (filed Apr. 8, 2009). The court treats both arguments together.

Section 55 of the current Burlington City Charter, which is entitled "City Property, How Sold or Leased," provides: "The city council shall have the exclusive power to authorize sale or lease of any real or personal estate belonging to said city, and all conveyances, grants or leases of any such real estate shall be signed by the mayor and

---

[12] The City argues that Plaintiffs have failed to prove the elements of "equitable estoppel," which is a theory Plaintiffs have advanced and argued in the context of their irrevocable license claim. The court finds the elements of easement by estoppel to more closely represent Plaintiffs' claim, and thus the parties' discussions of equitable estoppel are less helpful.

7

sealed with the city seal." Burlington City Charter, § 55, as codified in 24 App. V.S.A., ch. 3, § 55. The court does not read § 55 to mean that the only way to obtain an interest in City-owned real estate is by action of the City Council and the Mayor. As discussed below, it might be possible to acquire such an interest through, for example, adverse possession. Similarly, if an authorized agent of the City permits someone to use City land under the circumstances set forth in Restatement (Third) of Property (Servitudes) § 2.10, the City would be estopped from denying the existence of a servitude on that land. See My Sister's Place v. City of Burlington, 139 Vt. 602, 609 (1981) ("[W]hen a government agent acts within his authority, the government can be estopped by his actions."). The City appears to raise two arguments focusing on the authority of Sid Baker and George Crombie to permit Plaintiffs to use the Subject Property in 1977.

First, the City argues that § 55's requirements apply even to mere licenses to use City property. Presumably the argument goes that, without evidence that the requirements of § 55 were met, Baker and Crombie could not have given Plaintiffs any permission to use the Subject Property in the first place. The court notes that the City has not indicated whether § 55's requirements were in place in 1977. In addition, the City has not clarified how § 55 applies to licenses; indeed, § 55 does not explicitly mention licenses. In light of these circumstances, the court concludes it has insufficient materials available to adjudicate this particular issue. See 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2728.

The City also contends that neither Sid Baker nor George Crombie had actual or apparent authority to permit Plaintiffs to use the Subject Property. See City's Motion at 5 (filed Apr. 8, 2009). Actual authority can be express or implied, and implied actual

8

authority may be "inferred from the words used, from customs and from the relations of the parties." New England Educ. Training Serv., Inc. v. Silver Street P'ship, 148 Vt. 99, 103 (1987) (quoting Restatement (Second) of Agency § 7 cmt. c). Apparent authority "derives from conduct of the principal, communicated or manifested to the third party, which reasonably leads the third party to rely on the agent's authority." Id. at 105 (citing Restatement (Second) of Agency § 27 cmt. a).

As to the issues of authority, the factual record is insufficient to render summary judgment. See 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2725 ("Before the court can apply the law, it must have an adequate factual basis for doing so."). The parties have cited very little in the record bearing on this issue, and the court declines to rule without a more developed factual background. At least some facts suggest that there may be support for Plaintiffs' claim in this regard. For example, there is support in the record for the proposition that "there is a long-standing tradition in the City of Burlington that department heads can do such a thing [enter into an agreement to license use of City property]." Ex. G to City's Motion (filed Apr. 8, 2009). Although the City argues that there was no authorization for any City employee to grant a license to use the Subject Property, its statement of material facts sets forth no evidence (other than a lack of express actual authority) to support this claim.

## B. Easement by Necessity (Count III)

The City argues that it is entitled to summary judgment on this count because the doctrine of easement by necessity does not apply in cases where, as here, Plaintiffs' property is neither landlocked nor left without access to a public road. Plaintiffs do not contend that their property is landlocked or otherwise lacks access, but instead cite the

Restatement for the proposition that "[r]ights necessary to the enjoyment of property may include rights in addition to access, particularly when the property is severed into horizontal estates, or when nonpossessory interests are created. Support rights are necessary to the enjoyment of all horizontal estates that lie above other horizontal estates." Restatement (Third) of Property (Servitudes) § 2.15 cmt. b. It appears the right Plaintiffs seek in this count is the same as the right they seek in Counts I and II: the right to enter the Subject Property for the purposes of stabilizing the slope.

The usual requirements for an easement by necessity are that: "(1) there was a division of commonly owned land, and (2) the division resulted in creating a landlocked parcel." Berge v. State, 2006 VT 116, ¶ 6, 181 Vt. 1 (quoting Okemo Mountain, Inc. v. Town of Ludlow, 171 Vt. 201, 206 (2000)). In Berge, however, the Supreme Court stated that it would not "freeze the common law in time," and suggested that necessity could include not just access, but also services like telephone and electricity. Id. (citing Restatement (Third) of Property (Servitudes) § 2.15 cmt. d). Plaintiffs therefore argue that Berge expands the universe of rights necessary for reasonable enjoyment of property.

Berge involved a question of access, so it does not speak to this precise issue. But even assuming that the rights necessary to reasonable enjoyment of property for the purposes of easement by necessity include support rights, Plaintiffs have not presented evidence of a severance of rights arising out of common ownership. See Restatement (Third) of Property (Servitudes) § 2.15 cmt. c. Plaintiffs' only argument that the Bostock Property and the Subject Property were once held under common ownership is their unsupported allegation that, prior to the commencement of this lawsuit, all parties believed Plaintiffs held title to the Subject Property. Plaintiffs have provided no authority

10

for the proposition that such a "belief" could be sufficient to establish common ownership.

Plaintiffs argue that they do not need to prove common ownership, citing Connecticut cases including Bolan v. Avalon Farms Property Owners' Ass'n, 735 A.2d 798 (Conn. 1999). In Bolan the Connecticut Supreme Court concluded "that the unity of title doctrine should be abandoned and that the intent of the deed creating an easement should be effectuated even if no unity of title exists between the servient estate and the dominant estate the easement is intended to serve." Bolan, 735 A.2d at 804. Whatever effect Bolan had on Connecticut law, it does not represent the law in Vermont on this issue; our Supreme Court has recently reaffirmed the requirement of a division of commonly owned land. See Berge, 2006 VT 116, ¶ 6.

## C. Adverse Possession (Count IV)

To achieve title to land through adverse possession, a claimant must show that his use of the land was "open, notorious, hostile and continuous throughout the statutory period of fifteen years." MacDonough-Webster Lodge No. 26 v. Wells, 2003 VT 70, ¶ 24, 175 Vt. 382. "[I]f a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession." Id. ¶ 27 (quoting Hovendick v. Ruby, 10 P.3d 1119, 1122 (Wyo. 2000)). In light of Plaintiffs' claim that they hold a license to use the Subject Property, the court is unsure what Plaintiffs' position is, except that it appears Plaintiffs wish to proceed on alternative theories.

In any case, the City does not argue that Plaintiffs have failed to raise a triable issue on the elements of adverse possession, but instead contends that Plaintiffs cannot adversely possess the Subject Property because it is land "given, granted, sequestered or

11

appropriated to a public . . . use." 12 V.S.A. § 462. The City maintains that the Subject Property is part of a city park called Arthur Park, and, as such, is appropriated to public use. Plaintiffs say the deed conveying the land comprising Arthur Park does not make the boundaries clear, and that, given the City's "longstanding acquiescence" to Plaintiffs' use of the Subject Property, the City has abandoned any plans for public use of the Subject Property.

The Supreme Court has held that 12 V.S.A. § 462 does not exempt all municipal lands from adverse possession claims. Jarvis v. Gillespie, 155 Vt. 633, 642 (1991). Instead, land owed by a municipality is presumed to be given to a public use, but that presumption can be rebutted by demonstrating that the town has abandoned any plans for the land. Id. The determination depends in part upon the City's intention regarding the Subject Property. Evidence to be considered in determining that issue "may include the reason the property was acquired by the town, uses the town has made of the property since acquisition, and whether the town has manifested an intention to use the property in the future." Id. at 642–43.

The Vermont Supreme Court has said that courts should exercise caution in granting summary judgment where intent is a dispositive issue. Stamp Tech, Inc. ex rel. Blair v. Lydall/Thermal Acoustical, Inc., 2009 VT 91, ¶ 31. The court concludes that there are genuine issues of material fact that preclude summary judgment here. The City's failure to cite any material in the record for the proposition that the Subject Property is part of Arthur Park might be reason enough to deny summary judgment. As Plaintiffs' argument suggests, there appears to be a boundary dispute wrapped up in this case. In addition, for the reasons discussed above regarding easement by estoppel, the

12

parties dispute whether the City authorized any acquiescence to Plaintiffs' use of the Subject Property.

### D. Easement by Prescription (Count V)

The establishment of a prescriptive easement or right of use is shown by "open, notorious, hostile and continuous possession of the property at issue for a period of fifteen years." Cmty. Feed Store, Inc. v. Ne. Culvert Corp., 151 Vt. 152, 155 (1989). The City's argument on this count is the same as its argument on Count IV, and the same issues of material fact discussed above regarding adverse possession exist here.

### II. Plaintiffs' Claims for Damages

### A. Trespass and Nuisance (Counts VI and VII)

"[T]respass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it." John Larkin, Inc. v. Marceau, 2008 VT 61, ¶ 8, 184 Vt. 207 (quoting W. Keeton et al., Prosser and Keeton on the Law of Torts § 87, at 622 (5th ed. 1984)).[13] As best the court can discern, Plaintiffs' trespass and nuisance claims both arise from what they say are flows of water, pollutants, and sewage onto the Bostock Property due to the construction of the Route 127 beltline/northern connector in the 1970s, a wildlife sanctuary in 1986, and a stormwater project some time prior to 1991. The City contends that it is entitled to summary judgment on these claims because they are barred by the statute of limitations, 12 V.S.A. § 511, and because Plaintiffs have failed to make a showing sufficient to

---

[13] The court recites this distinction only for the purposes of background. The court's decision in this case does not rely on the distinction between trespass and nuisance, so the court treats them together.

establish the existence of elements essential to their claims, <u>Poplaski v. Lamphere</u>, 152 Vt. 251, 254–55 (1989).

As to the statute of limitations, Plaintiffs do not appear to dispute that they discovered their alleged injuries flowing from various construction projects long before the limitations period. <u>Lillicrap v. Martin</u>, 156 Vt. 165, 175–76 (1989) (articulating discovery rule).[14] Instead, Plaintiffs argue that their injuries are continuous, and therefore the statute of limitations does not bar their claims.[15]

The City replies with four arguments. First, the City argues that the Vermont Supreme Court did not adopt the continuing tort doctrine in <u>Gettis v. Green Mountain Economic Development Corp.</u>, 2005 VT 117, 179 Vt. 117. Second, the City contends that, even if the continuing tort doctrine does apply, it still does not help Plaintiffs because the City has not performed any additional tortious act within the limitations period. Third, the City argues that there is no "continuing tort" because the construction projects permanently changed the physical condition of the land. Finally, the City argues that Plaintiffs' nuisance and trespass claims are just a guise for the fact that their action is already barred as an out-of-time action for an inverse condemnation.

---

[14] Indeed, Plaintiffs have conceded that any claim that the City negligently constructed the drainage pipes during the beltline construction in the 1970s would be time-barred under 12 V.S.A. § 511. In addition, it appears from Plaintiffs' 1991 letter that, by that time, they knew of the water problems they allege here, and had formed a belief as to who was responsible.

[15] To the extent Plaintiffs also argue that communications between themselves and the City constitute an "active, continuous relationship" of trust and confidence which tolls the statute of limitations, they cite no Vermont authority for such an exception, and none appears in language of 12 V.S.A. § 511. In fact, of the authorities Plaintiffs do cite—all of which are from Oregon—one court expressed doubt about the exception Plaintiffs seek to invoke: "In candor, it is difficult to imagine that such a 'special rule' would pass muster under current standards of statutory construction." <u>Rutter v. Neuman</u>, 71 P.3d 76, 80 (Or. Ct. App. 2003). Even if there were such an exception in Vermont, it would not apply here. The communications between Plaintiffs and the City do not approach the kind of relationship the Oregon Supreme Court suggested might toll the statute. <u>See</u> <u>Cavan v. Gen. Motors Corp.</u>, 571 P.2d 1249, 1250 (Or. 1977) ("The classic example is the doctor-patient relationship.").

14

Regarding the City's first argument, the court notes that <u>Gettis</u> neither adopted nor rejected the continuing tort doctrine. The Supreme Court simply did not reach that issue because it concluded that, even if it were to adopt the doctrine, it would not have helped the plaintiffs in that case. <u>Gettis</u>, 2005 VT 117 at ¶ 25.

As to the City's second argument, <u>Gettis</u> did state that an additional tortious act within the limitations period is a necessary element of a claim under the continuing tort doctrine. <u>Id</u>. The Court elaborated:

> The continuing tort doctrine requires that a tortious act—not simply the continuing ill effects of prior tortious acts—fall within the limitation period. The necessary tortious act cannot be the failure to right a wrong committed outside the limitation period. If it were, the tort in many cases would never accrue because the defendant could undo all or part of the harm.

<u>Id</u>. at ¶ 28 (citations omitted). If the Supreme Court intended this broad pronouncement to cover all torts, including nuisance and trespass, then this court would not need to proceed any further, since Plaintiffs have not directed the court's attention to any tortious act within the limitation period.

However, the <u>Gettis</u> Court was not called upon to analyze the continuing tort doctrine in the specific context of claims for trespass and nuisance, which appears to be an unsettled area of law. <u>E.g.</u>, <u>Marilyn Froling Revocable Living Trust v. Bloomfield Hills Country Club</u>, 769 N.W.2d 234, 245 (Mich. Ct. App. 2009) ("The law relating to the current viability of the continuing wrongs doctrine in the context of nuisance and trespass claims is hopelessly confused."). Relying on <u>Traver Lakes Community Maintenance Ass'n v. Douglas Co.</u>, 568 N.W.2d 847 (Mich. Ct. App. 1997), Plaintiffs point to differences between negligence claims and claims for trespass and nuisance, and

15

argue that those differences obviate the requirement that some conduct contributing to the trespass or nuisance be committed within the limitation period.

In short, the City says the inquiry should be focused on the City's actions, while Plaintiffs say it should be focused on the nature of the trespass or nuisance. Courts in other jurisdictions are split on that issue. See Jacques v. Pioneer Plastics, Inc., 676 A.2d 504, 507 (Me. 1996) (contrasting Massachusetts approach focusing on actor's conduct with Maine's approach focusing on nature of the nuisance or trespass). The Gettis opinion suggests that, assuming it were to recognize the continuing tort doctrine, our Supreme Court might adopt an approach for trespass and nuisance claims similar to that in Massachusetts. However, this court concludes that, as to claims for trespass or nuisance, the Gettis Court's statements are dicta and this issue is unsettled in Vermont.

Even assuming, however, that the continuing tort doctrine is available, the question becomes: is the alleged trespass or nuisance continuous or permanent? See Hoery v. United States, 64 P.3d 214, 218 (Colo. 2003); D. Dobbs, The Law of Torts § 57, at 115 (2001) ("If the defendant's nuisance or trespass continues to cause harm to the plaintiff's interests in land, courts usually begin by classifying the invasion as either permanent (completed) or temporary and continuing.").

> In theory, if a nuisance is deemed permanent, there is only one unceasing invasion of the plaintiff's interests and only one cause of action. This necessarily arises when the invasion first began or was first manifest. The statute of limitations on the one cause of action must, then, begin running from the time it became manifest. In contrast, if the nuisance or trespass is "temporary," or "continuous," a new cause of action arises day by day or injury by injury, with the result that the plaintiff in such a case can always recover for such damages as have accrued within the statutory period immediately prior to suit.

D. Dobbs, Remedies § 5.4, at 343 (1973) (footnotes omitted).

16

Courts have reached varying and sometimes conflicting conclusions as to what is "permanent" and what is "temporary." See D. Dobbs, The Law of Torts § 57, at 115–16 (2001) ("Conflicting decisions and factual variety make statement of a general rule perilous. . . . It is not easy to find harmony in the case results."); W. Keeton, et al., Prosser and Keeton on Torts § 13, at 84 (5th ed. 1984) ("The courts are not in accord in dealing with this question."). As to these classification decisions, Dobbs writes in his Remedies treatise that, "[p]ut . . . bluntly, the classification as 'permanent' is not finding of fact nor a logical deduction; it is only a short-hand way of saying that certain policy decisions have been made." D. Dobbs, Remedies § 5.4, at 343 (1973). However, in his treatise on torts, Dobbs suggests that policy determinations are among a variety of factors courts consider. See D. Dobbs, The Law of Torts § 57, at 117 (2001) ("Classification as permanent or temporary is partly a matter of fact and partly a matter of policy seemingly governed by a number of factors."). Those factors include whether the invasion can be terminated or abated, and whether the cost of termination is wasteful or oppressive. Id. at 117–18.

One solution might be to simply send the classification question to the jury. See Traver Lakes Cmty. Maint. Ass'n v. Douglas Co., 568 N.W.2d 847, 853 (Mich. Ct. App. 1997). In this case, however, Plaintiffs have failed to come forward with evidence that their alleged injury is abatable, or that the cost of terminating the alleged nuisance or trespass is neither wasteful nor oppressive. At best, Plaintiffs have simply asserted that there is a "possibility" that remedial action could be taken to reduce the flooding. Pls.' Surreply at 16 (filed Sept. 1, 2009). That assertion is unpersuasive in this procedural context. Plaintiffs' burden is to show facts presenting a genuine issue worthy of trial—

17

not a heavy burden—but mere general allegations or possibilities are not sufficient to meet that burden. See 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2727 & n.60.

In addition, the policy factors strongly favor a classification of "permanent." The policy considerations in this case are much like those in cases "where the property invasion will and should continue indefinitely because defendants, with lawful authority, constructed a socially beneficial structure intended to be permanent." Hoery v. United States, 64 P.3d 214, 220 (Colo. 2003). Here, the construction projects that Plaintiffs claim have caused flooding on their land—a road, a wildlife sanctuary, and a stormwater project—were intended to be socially beneficial and permanent. Plaintiffs have not argued that they were constructed without lawful authority. Because the court concludes that the invasions here are permanent, the causes of action accrued at one time, not on repeated occasions. See D. Dobbs, Remedies § 5.4, at 343 (1973). The court therefore does not reach the City's remaining arguments.

### B. Breach of Duty to Provide Lateral Support (Count VIII)

Plaintiffs claim the City is liable for withdrawal of lateral support under Restatement (Second) of Torts § 817 and, alternatively, under Restatement (Second) of Torts § 819. As with Plaintiffs' nuisance and trespass claims, the City argues that the statute of limitations bars this claim, and that Plaintiffs have failed to establish the essential elements of the claim.

As to the statute of limitations in cases involving lateral support, the Restatement specifically provides: "The statute of limitations does not begin to run until a subsidence occurs and it runs then only for that subsidence. The actor continues subject to liability

18

for a further distinct subsidence although it flows from the same act." Restatement (Second) of Torts § 817 cmt. i. Thus the limitations period did not begin to run when the wood debris was dumped, or when it caught fire, or when the City extinguished it. Instead, for each distinct subsidence, a new limitations period began to run.[16] The court therefore concludes that the statute of limitations is not a complete bar, but that Plaintiffs' claims are limited to distinct substantial subsidences occurring within the limitations period. However, Plaintiffs have failed to identify any distinct, substantial subsidence within the limitations period. Thus, it appears that the statute of limitations does bar these claims.

But even if that were not a bar, the court would still grant the City's motion on this count because, for the reasons discussed below, Plaintiffs have failed to make a showing sufficient to establish the existence of elements essential to their claims. Poplaski v. Lamphere, 152 Vt. 251, 254–55 (1989).

There are essentially two kinds of claims for withdrawal of lateral support. "One who withdraws the naturally necessary lateral support of land in another's possession or support that has been substituted for the naturally necessary support, is subject to liability for a subsidence of the land of the other that was naturally dependent upon the support withdrawn." Restatement (Second) of Torts § 817(1). That liability may extend to "harm to artificial additions resulting from the subsidence." Id. § 817(2). This sort of claim is a strict liability claim. In addition, "[o]ne who negligently withdraws lateral support of land in another's possession, or of artificial additions to it, is subject to liability for harm resulting to the other's land and to the artificial additions on it." Id. § 819.

---

[16] Although subsidence is defined broadly in the Restatement, see id. cmt. h, only a "substantial" subsidence can form the basis of liability. See id. cmt. i.

In its Reply filed May 22, 2009, the City suggests Plaintiffs have not made clear what they claim the City did that constitutes a withdrawal of lateral support, and surmises that Plaintiffs must be referring to its firefighting efforts in 1976. As best the court can tell, Plaintiffs have not argued otherwise.

The court concludes that Plaintiffs cannot go forward with a negligence claim under § 819 because such a claim effectively seeks to impose liability on the City for failure to respond reasonably for the purpose of extinguishing a fire. The City is immune from such claims:

> There shall be no liability imposed by law on the system or on any municipality, on the personnel of its fire department, nor on any private fire department or its personnel, belonging to such a system, for failure to respond or to respond reasonably for the purpose of extinguishing a fire or assisting in the case of other accidental or natural emergency. This immunity is not intended to be exclusive of other immunities existing by statute or at common law.

20 V.S.A. § 2990. Plaintiffs' claim under § 819 appears to be that the City failed to respond reasonably to a fire. See Pls.' Surreply at 20 (filed Sept. 1, 2009) (arguing that "[a] jury could decide that the use of explosives and 55 million gallons of water was unreasonable"). Plaintiffs' argument that § 2990 should not apply because the 1976 fire was not a "standard firefighting scenario" is not persuasive; the statute does not distinguish between scenarios. Plaintiffs also argue that § 2990 should not apply because the fire would not have occurred if the City had not dumped the tree debris in the first place. Just as § 2990 does not distinguish between firefighting scenarios, it does not depend on the cause of the fire.[17]

---

[17] Even if § 2990 did not bar Plaintiffs' claim of negligent withdrawal of lateral support, the court would still grant summary judgment because, for the reasons discussed below, Plaintiffs have failed to present expert testimony linking the washing away of any support in 1976 to any distinct, substantial subsidence within the limitations period.

Assuming that 20 V.S.A. § 2990 does not also bar Plaintiffs' strict liability claim under § 817, the court turns to the City's contention that Plaintiffs have failed to present facts that support the elements of such a claim. Those elements are as follows: "(1) the withdrawal of naturally necessary lateral support; (2) a subsidence of land; and (3) natural dependence of the supported land upon the support withdrawn." Id. § 819 cmt. c.

Plaintiffs have failed to raise a triable issue as to the first element. As to that element, the Restatement explains:

> Naturally necessary lateral support is that support which the supported land itself requires and which, in its natural condition and in the natural condition of the surrounding land, it would require. It does not include the support needed because of the presence of artificial additions to or other artificial alterations in the supported land or the surrounding land. The measure of this right of the other and of this duty of the actor is the natural dependence of land upon land, and the right and duty are not enlarged by alterations of the natural condition. Lateral support made necessary by these alterations is not naturally necessary support.

Id. § 817 cmt. c.

Here again, Plaintiffs' theory is not exactly clear. The City says "Plaintiffs' claim is based upon the theory that the stump dump debris field is sliding down the original hillside and is not based upon a subsidence of the original hillside." Def.'s Reply at 13 (filed May 22, 2009). Plaintiffs respond only that "any distinction between the original hillside and the debris field is irrelevant for purposes of § 817 of the Restatement." Pls.' Surreply at 19 (filed Sept. 1, 2009). The court disagrees. To the extent the debris field can be considered "land" at all, it is fill, not land in its natural condition. See XI Properties, Inc. v. RaceTrac Petroleum, Inc., 151 S.W.3d 443, 448 (Tenn. 2004) ("Where, as here, a landowner alters his land by filling, thus raising the level of the land above its

21

natural state, there is no right of lateral support from adjoining landowners with respect to the altered portion of the land.").

However, it appears to the court that Plaintiffs are alleging that the action of the water on the "original hillside" in 1976 has caused subsidences within the 6-year limitations period. See Pls.' Surreply at 18 (filed Sept. 1, 2009) ("Plaintiffs resubmit the facts and applicable law already articulated in their Memorandum in Opposition to Partial Summary Judgment on Count VIII."); Pls.' Opp'n at 29 (filed Apr. 15, 2009) (referring to Gifford's testimony that the water used to extinguish the fire "could have disturbed that original slope—that native slope underneath the debris field"). But if this is Plaintiffs' claim, Plaintiffs have failed to raise a triable issue as to the second and third elements of a claim under § 817. Namely, Plaintiffs have failed to offer any expert testimony linking the washing away of any part of the native slope to any distinct, substantial subsidence within the limitations period. At best, Plaintiffs have offered the report of Gregory Gifford, which suggests that erosion of the original slope "could have" steepened it, raising a "concern" that soils supporting the Plaintiffs' residence "could have" been undercut "as it has done at the garage." Pls.' Opp'n at 30 (filed Apr. 15, 2009). Those statements are not sufficient expert opinion to establish a causal link between the washing away of any soils in 1976 and any distinct, substantial subsidence within the limitations period.

Order

The City's motion for summary judgment as to Counts I, II, IV, and V is denied. The motion for summary judgment as to Counts III, VI, VII, and VIII is granted. Thus the remaining claims are those of irrevocable license/equitable estoppel, adverse

possession, and easement by prescription. The case will be set for the next jury draw and a pretrial conference.

Dated at Burlington this      day of January 2010.

_____
Helen M. Toor, Superior Court Judge